UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | No. 03-08024A (RDD) |
| PARK SOUTH SECURITIES, LLC, | Substantively Consolidated |
| Debtor. | (SIPA Liquidation) |
| IRVING H. PICARD, Trustee for the Liquidation of Park South Securities, LLC and Eberhard Investment Associates, Inc., | Adv. Proc. No. |
| Plaintiff, | **COMPLAINT TO AVOID AND RECOVER FRAUDULENT TRANSFERS AND FOR OTHER RELIEF** |
| v. | |
| TODD M. EBERHARD, KRISTEN EBERHARD, SANDI EBERHARD and KERRY EBERHARD, | |
| Defendants. | |

Plaintiff Irving H. Picard, as trustee ("Trustee") for the liquidation of Park South Securities, LLC ("Park South" or "Debtor") and Eberhard Investment Associates, Inc. ("EIA"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa et seq. ("SIPA"),[1] by his undersigned counsel, as his complaint ("Complaint") against Todd M. Eberhard, Kristen Eberhard, Sandi Eberhard and Kerry Eberhard (collectively, "Defendants"), alleges the following:

---

[1] For convenience, subsequent references to SIPA will omit "15 U.S.C. _____."

## INTRODUCTION

1.     This is an action to avoid and recover from the Defendants sums transferred to them as a result of the looting of millions of dollars from the accounts of Defendant Todd M. Eberhard's ("Todd Eberhard") customers.

2.     From 1991 to 2003, Todd Eberhard, with the assistance of employees at his investment advisory and securities brokerage companies, misappropriated millions of dollars' worth of funds from his customers' accounts.

3.     In the process, Todd Eberhard looted customer accounts and misappropriated funds not only for his own use, but also for the benefit of several relatives, including his wife, Defendant Kristen Eberhard; his mother, Defendant Sandi Eberhard; and his sister, Defendant Kerry Eberhard.

4.     By this Complaint, the Trustee seeks to recover from the Defendants the ill-gotten proceeds of Todd Eberhard's fraudulent conduct so that the Trustee may endeavor to return these funds to Park South's customer fund for the benefit of over-the-limits customers under SIPA and SIPC, as subrogee, as discussed in paragraphs 118 through 121 below.

## NATURE OF THE PROCEEDING

5.     This adversary proceeding ("Adversary Proceeding") is brought pursuant to Sections 78fff(b) and 78fff-2(c)(3) of SIPA, 11 U.S.C. §§ 105(a), 544, 547, 548(a), 550(a) and 551[2] and the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270 et seq.), as well as common law theories of recovery, as described below, and for related relief.

---

[2] References to applicable sections of title 11, United States Code, 11 U.S.C. § 101 et seq., are hereinafter referred to as sections of the Bankruptcy Code.

#810764 v4
104300-48559

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 157(b) and 1334(b).

7.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O).

8.     Venue in this district is proper under 28 U.S.C. § 1409(a).

## RELEVANT PROCEDURAL HISTORY

9.     On February 5, 2003, the Securities and Exchange Commission ("SEC") filed a complaint, as subsequently amended (" SEC Complaint"), in the United States District Court for the Southern District of New York ("District Court") against Park South, Todd Eberhard and Eberhard Investment Associates, Inc., as well as Stone House Capital Partners LP ("Stone House") as relief defendant (No. 03 CV 813 (RMB)).  The SEC Complaint alleged that the Debtor, Eberhard and EIA engaged in fraud, including, inter alia, churning and misappropriation of customer funds, in connection with certain brokerage accounts under their control ("SEC Action").  Also on February 5, 2003, the District Court signed an order appointing Aaron R. Marcu as receiver in the SEC Action ("SEC Receiver").

10.     On February 10, 2003, pursuant to Section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of the SEC Action with the application of the Securities Investor Protection Corporation ("SIPC"), also filed in the District Court, pursuant to Section 78eee(a)(3) of SIPA alleging, inter alia, that Park South was not able to meet its obligations to securities customers as they came due and that its customers needed the protection afforded by SIPA.

- 3 -

11.     By order of the District Court dated February 10, 2003, entered pursuant to the

provisions of SIPA, Park South consented to certain relief, which, in pertinent part:

(a)     placed Park South in liquidation under SIPA;

(b)     appointed the Trustee pursuant to Section 78eee(b)(3) of SIPA;

(c)     required the filing of a fidelity bond by the Trustee in the amount of

$200,000.00; and

(d)     removed the liquidation proceeding to the United States Bankruptcy Court

for the Southern District of New York ("Bankruptcy Court") pursuant to Section

78eee(b)(4) of SIPA.

12.     Pursuant to Section 78lll(7)(B) of SIPA, the Filing Date is deemed to be the date on

which the SEC Complaint was filed and in which Action the SEC Receiver was appointed and,

therefore, is further deemed to be the date of the filing of the petition within the meaning of Sections 547

and 548 of the Bankruptcy Code and N.Y. Debt. & Cred. § 213.

13.     By order dated February 21, 2003, the Bankruptcy Court approved the Trustee's

Bond.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the substantively

consolidated estate of Park South and EIA.  By Order entered on March 26, 2003, the Bankruptcy

Court found that the Trustee was a disinterested person and ordered that he continue in his capacity as

Trustee.

14.     By order dated September 10, 2003, after a hearing on notice and over the objection

of Todd Eberhard, the Bankruptcy Court entered an order substantively consolidating the assets and

#810764 v4
104300-48559

liabilities of EIA with the estate of Park South and authorizing the Trustee to be the representative of and fiduciary for EIA.

#810764 v4
104300-48559

## PARTIES

15.     Todd Eberhard, at all times relevant to the allegations in this Complaint, provided investment advice to individual investors and managed the funds of individual investors. Todd Eberhard held Series 7, 24, 63 and 65 licenses with NASD and was registered in 1987 with NASD as a general securities principal and a representative with the SEC. He was also a television personality who appeared on several financial talk shows. Todd Eberhard resides at 188 East 78th Street, Apartment 9-A, New York, New York.

16.     Kristen Eberhard married Todd Eberhard on September 12, 1998. Kristen Eberhard, a former model, is the sole shareholder and principal of Eberhard Management, Inc., a business management firm formed in March 1998. Kristen Eberhard resides at 188 East 78th Street, Apartment 9-A, New York, New York.

17.     Sandi Eberhard, Todd Eberhard's mother, resides at 533 Verbank Road in Millbrook, New York, and at 404 East 76th Street, Apartment 2-N, New York, New York.

18.     Defendant Kerry Eberhard, Todd Eberhard's sister, at all times relevant to the allegations in this Complaint, resided in the vicinity of Mexico City, Mexico.

19.     The Defendants are insiders of EIA within the meaning of 11 U.S.C. § 101(31)(B).

## RELEVANT ENTITIES

20.     EIA and its predecessor entity, Eberhard Investment Advisors, Inc. (collectively "EIA"), were entities incorporated and located in the State of New York through which Todd Eberhard rendered investment advice for the trading of securities and general advice regarding investment strategies and financial planning for the accounts of his customers. By 1999, Todd Eberhard was the

- 6 -

sole shareholder and CEO of EIA, which had its principal place of business in New York, New York.

EIA was not a registered investment adviser or broker-dealer and has never been a member of SIPC or

NASD. Because EIA was not a securities broker-dealer, it entered into relationships with securities

broker-dealers to enable EIA to place securities transactions and otherwise manage the funds entrusted

to it by customers.

21.    Prior to his affiliation with the broker-dealer discussed in paragraph 22 below, Todd

Eberhard was affiliated with the following three securities broker-dealers:  Nathan & Lewis Securities,

Inc., Linsco/Private Ledger, and  Royal Alliance Associates, Inc.  Todd Eberhard was discharged by

Royal Alliance Associates, Inc. for violating its policy on mutual funds.

22.    Clearing Services of America, Inc. ("CSA"), a corporation organized under the laws of

Missouri, was at all times relevant to the allegations in this Complaint a securities broker-dealer

registered with the SEC and a member of NASD and SIPC.  Its principal place of business was St.

Louis, Missouri.  EIA used the brokerage services of CSA from November 1998 through December

2001, when Todd Eberhard was registered both as a general securities principal and a general securities

representative employed by CSA.  In that period, Todd Eberhard solicited and received funds from

customers that he managed through individual brokerage accounts held in the name of each customer at

Pershing LLC, the firm to which CSA introduced its customer accounts.

23.    Park South, a limited liability company organized under the laws of the State of New

York,[3] was an introducing broker that at all times relevant to the allegations of this Complaint had

several places of business, including one in New York, New York.  Park South was registered with the

#810764 v4
104300-48559

SEC as an investment adviser and a securities broker-dealer and was a member of SIPC and NASD. Todd Eberhard was a substantial owner of Park South from July 1999 through February 2003, and served as its chairman. In late 2001, Todd Eberhard left CSA for Park South and his customers' accounts were transferred from Pershing to a new clearing firm, as discussed in paragraph 24 below.

24. Correspondent Services Corporation ("CSC"), a clearing broker, was at all times relevant to the allegations in this Complaint a wholly owned subsidiary of UBS Paine Webber and was located in Weehawken, New Jersey. From December 2001 through February 2003, pursuant to a clearing agreement dated August 21, 2001, Park South cleared all of its customers' accounts, on a fully disclosed basis, through CSC. CSC provided other services for Park South customers, including the issuance of monthly account statement and confirmation of transactions in customer accounts.

25. Powell Transactions, Ltd. ("Powell Transactions"), an entity incorporated in the State of New York with its principal place of business at EIA's address was at all times relevant to the allegations in this Complaint an entity that Todd Eberhard used to make settlement payments and conduct certain of his personal affairs, including the purchase of real estate. Todd Eberhard was the Chief Executive Officer and owner of Powell Transactions, but Powell Transactions was not an entity through which Todd Eberhard conducted investment advisory business nor with which EIA account-holders had a customer relationship.

26. Powell Transactions is an insider of EIA within the meaning of 11 U.S.C. § 101(31)(E).

27. Stone House, a New York general partnership formed in 2000, purported to be at all times relevant to the allegations of this Complaint a hedge fund. One of Stone House's two founding

---

3      While Park South does not appear to have commenced operating until November or December 2001, it was

#810764 v4
104300-48559

partners was also a registered representative with Park South. Stone House shared offices with Park South in Melville, New York.

## THE FRAUDULENT SCHEME

28. From 1991 through May 2003, Todd Eberhard conspired with the following EIA employees to defraud certain customers for whom Todd Eberhard provided investment advisory and securities brokerage services:

(a) Mary Breakiron ("Breakiron"), who was an employee of EIA from 1988 to December 5, 2001. Breakiron was an administrative assistant who placed mutual fund trade orders at Todd Eberhard's direction;

(b) John Heck ("Heck"), who was the EIA office manager and who worked for Todd Eberhard from 1991 to 2003. Heck communicated trades for Todd Eberhard's customer accounts to the broker-dealer at which Todd Eberhard was employed. Heck also organized customer accounts;

(c) Craig Hoberman ("Hoberman"), an EIA administrative assistant who reported to Heck and assisted Heck with administrative duties, including making wire transfers;

(d) Brian Mercier ("Mercier"), who worked for Todd Eberhard for over 10 years and was responsible for controlling EIA's operational bank accounts, paying EIA's bills, maintaining the payroll for EIA employees and making wire transfers. Mercier also handled Todd Eberhard's real estate matters; and

---

organized as a limited liability company under the laws of the State of New York in July 1999.

#810764 v4
104300-48559

(e)     Jeffrey Zisselman ("Zisselman"), a lawyer who worked at EIA from 1998 to January 2002.  Zisselman was a principal of Park South.

29.     As part of the fraudulent scheme, Todd Eberhard and his employees looted his customers' accounts by misappropriating millions of dollars' worth of funds through a variety of means. The property in the customers' accounts constituted "customer property" ("Customer Property") as that term is defined in Section 78lll(4) of SIPA.

30.     First, Todd Eberhard and EIA employees looted Todd Eberhard's customers' accounts by making unauthorized withdrawals from such accounts and depositing these improperly withdrawn funds into his own accounts or into entities or accounts held in the name of entities that he controlled.

31.     Second, Todd Eberhard and EIA employees made unauthorized withdrawals from customer accounts and transferred them to third-party entities over which Todd Eberhard had no control.

32.     Third, Todd Eberhard and EIA employees covered-up the looting of certain customer accounts by later depositing back into those accounts funds withdrawn -- without authorization -- from accounts of other customers.

33.     Fourth, Todd Eberhard and EIA employees defrauded customers by "churning" their accounts to generate millions of dollars in commissions for Todd Eberhard.  Todd Eberhard and EIA employees churned customer accounts in part by engaging in the inappropriate buying and selling of Class B Shares of mutual funds.

34.     Fifth, Todd Eberhard concealed his looting of customer accounts by making false statements to customers about the value of their accounts.  These misrepresentations included false

- 10 -

statements to customers that their account statements did not reflect the correct balance in their accounts because certain trades had not settled as of the date of the account statement.

35. Sixth, Todd Eberhard also concealed his fraudulent conduct by falsifying documents, and directing EIA employees to falsify documents, relating to customer accounts. For example, Todd Eberhard and EIA employees created false account statements and doctored real account statements to conceal the losses in and withdrawals from customers' accounts. Todd Eberhard and EIA employees also prevented customers from seeing accurate account statements by intercepting the accurate account statements and having them forwarded to addresses under Todd Eberhard's control.

36. Todd Eberhard appropriated for his own personal use, and for that of his wife, mother and sister, the unauthorized withdrawals deposited into insider accounts, unauthorized withdrawals transferred to third-party entities, unauthorized withdrawals transferred to other customer accounts and losses due to churning (collectively, "Unauthorized Withdrawals").

37. Todd Eberhard used the Unauthorized Withdrawals to pay EIA employees exorbitant salaries, to make settlement payments to former customers who had complained about his fraudulent conduct so that those customers would not report his conduct to law enforcement or securities regulatory authorities and to pay customers and employees who had threatened to expose Todd Eberhard's fraudulent conduct to law enforcement and expose his intimate relationships with women other than his wife, Kristen Eberhard.

38. Todd Eberhard also used the Unauthorized Withdrawals to provide his wife, Kristen Eberhard, with a monthly allowance of $5,000, to transfer funds to Kristen Eberhard for use in conjunction with her business management company, to pay a portion of Kristen Eberhard's personal

#810764 v4
104300-48559

credit card expenses and to pay his and Kristen Eberhard's mortgage, condominium, management, electric and decorator expenses with regard to their apartment at 188 East 78th Street, New York, New York.

39.     Todd Eberhard also used the Unauthorized Withdrawals to obtain health insurance for his mother, Sandi Eberhard. Todd Eberhard accomplished this by placing Sandi Eberhard on the EIA payroll even though Sandi Eberhard performed no work for EIA. Todd Eberhard also used the misappropriated funds to pay Sandi Eberhard's mortgage, insurance and decorator expenses with regard to her apartment at 404 East 76th Street, New York, New York.

40.     Todd Eberhard also used the Unauthorized Withdrawals to obtain health insurance for his sister, Kerry Eberhard. Todd Eberhard accomplished this by placing Kerry Eberhard on the EIA payroll even though Kerry Eberhard, who lived in Mexico, performed no work for EIA.

**A.     Unauthorized Withdrawals Deposited Into Insider Accounts**

41.     Todd Eberhard and certain EIA employees misappropriated not less than $2.3 million directly from customer accounts by instructing the clearing firm to make unauthorized withdrawals of funds from the account of one customer and depositing the funds into accounts in which Todd Eberhard had a beneficial interest. Todd Eberhard made and directed these withdrawals without the authorization of his customers, knowing that he did not have authorization to do so, and in violation of his fiduciary duties to his customers.

42.     Todd Eberhard and EIA employees effectuated the unauthorized withdrawal of customer funds for deposit into an account in which Todd Eberhard had an interest by preparing, or directing an EIA employee to prepare, a letter purporting to bill a customer a percentage of that

#810764 v4
104300-48559

customer's total holdings as a fee for Todd Eberhard's management services. Todd Eberhard's customers, however, paid for his services not by management fees based on total holdings but by commissions generated by trading. Todd Eberhard directed that the purported "bill" for his management services be placed in the customer's EIA file but not be sent to the customer.

43.     Todd Eberhard then directed the EIA employee to notify Park South's or CSA's clearing broker that this was an authorized transfer and directed that a check be issued in the amount specified in the fraudulent management fee "bill," made payable to the Eberhard-controlled shell company, Powell Transactions. The signature of the customer purportedly authorizing the payment of funds to Powell Transactions was forged by Todd Eberhard or by an EIA employee acting under Todd Eberhard's direction.

44.     Todd Eberhard, or an EIA employee acting at Todd Eberhard's direction, deposited the check issued by the broker-dealer for the bogus management fee into Todd Eberhard's Powell Transactions bank account.

45.     The unauthorized withdrawals that were deposited into insider accounts included, but were not limited to, the following:

(a)     on October 18, 2001, Todd Eberhard caused a disbursement in the amount of $24,200 to be made from the account of his customer, Michael Newbro, payable to EIA's account at Dime Savings Bank, in care of Kristen Eberhard.

(b)     on December 4, 2001, Todd Eberhard caused a disbursement in the amount of $13,000 to be made from the account of his customer, Dale Lynn Sigal, payable to EIA's account at Dime Savings Bank, in care of Kristen Eberhard.

- 13 -

(c)      on December 27, 2001, Todd Eberhard caused a disbursement in the   amount of $30,000 to be made from the account of his customer, Joann Jacobsen, payable        to EIA's account at Dime Savings Bank, to the attention of Kristen Eberhard.

**B.      Unauthorized Withdrawals Transferred to Third-Party Entities**

46.      Todd Eberhard and EIA employees misappropriated not less than $3.2 million directly from customer accounts by causing the unauthorized withdrawal of funds from their accounts and transferring the funds to third-party entities.  Todd Eberhard made and directed these withdrawals without the authorization of his customers, knowing that he did not have authorization to do so, and in violation of his fiduciary duties to his customers.

47.      Todd Eberhard effectuated the unauthorized withdrawal of customer funds for transfer to a third-party entity by preparing, or directing an EIA employee to prepare, a letter purporting to be a customer's authorization for the transfer.

48.      The unauthorized withdrawals that were transferred to third-party entities included, but were not limited to, the following:

(a)      in December 2002, Todd Eberhard caused the unauthorized transfer to Stone House of a total of $1,750,000 from seven accounts of the following Park South customers:  (i) Anne W. Fox; (ii) Heather Fraunberger; (iii) James William Hagerty; (iv) Frank Knafelc and Myrlen Ann Knafelc; (v) Robert Pellegrini; (vi) Brian Rose and Katherine Schwan; and (vii) Dale Lynn Sigal.  These funds were subsequently turned     over to the Trustee.

- 14 -

49. At Todd Eberhard's direction, Hoberman forged the signatures of the above-listed Park South customers on the subscription forms underlying the seven unauthorized transfers to Stone House. These forged signatures were notarized by Todd Eberhard.

**C.  Unauthorized Withdrawals Transferred to Other Customer Accounts**

50. Todd Eberhard and EIA employees misappropriated not less than $2.4 million directly from customer accounts by causing funds from the account of one customer to be transferred to the account of another. Todd Eberhard made and directed these transfers and withdrawals without the authorization of his customers, knowing that he did not have authorization to do so, and in violation of his fiduciary duties to his customers.

51. Todd Eberhard effectuated the unauthorized transfer of funds from one customer account to another customer account by directing EIA employees such as Heck and Hoberman to forge the signatures of the customers on letters purportedly requesting and authorizing the movement of funds. Todd Eberhard made unauthorized transfers of funds from one customer account to another customer account in order to cover shortfalls in customer accounts caused by his underlying unauthorized withdrawals and churning.

52. The unauthorized withdrawals that were transferred to other customer accounts included, but were not limited to, the following:

(a) Robert Pellegrini entrusted approximately $12 million to Todd Eberhard in early 1999 to be held in individual and IRA accounts. Between early 1999 and December 2002, Todd Eberhard repeatedly made unauthorized transfers of funds from Robert Pellegrini's accounts to other customers' accounts to cover shortfalls in the other

- 15 -

customers' accounts caused by Todd Eberhard's underlying unauthorized withdrawals and churning. By December 2002, the combined value of Robert Pellegrini's accounts was approximately $1.5 million.

**D.**     **Losses Due to Churning**

53.     Prior to 2002, Todd Eberhard churned customer accounts by engaging in excessive trading, which caused him to earn no less than $4.5 million in fraudulently obtained commissions, fees and other compensation.

54.     Todd Eberhard received commission income through his trading activity in customer accounts. His commissions were calculated by agreement with the broker-dealer office from which he was operating. The amount of money Todd Eberhard received in commissions was determined based on the volume and nature of transactions he conducted in customer accounts. Typically, the more trades Todd Eberhard conducted, the higher the commissions that he received were. Todd Eberhard received an average of approximately $400,000 per month in commissions from the combined trading in his customers' accounts. These funds were deposited into EIA's business operations account.

55.     In the securities industry, the term "churning" refers to a pattern of excessive and unsuitable trading conducted by a broker with discretion over a customer's account, or caused by a broker's bad faith recommendations to a customer, for the purpose of generating commissions for the broker. Churning is often accomplished by selling positions that have increased slightly, and the broker usually justifies such sales by explaining the need for the customer to realize profits.

56.     From 1991 to February 2003, Todd Eberhard exercised investment discretion over various of his customers' accounts and, on behalf of these customers, bought and sold securities,

- 16 -

including shares of mutual funds. In some instances, the customers knowingly provided him with discretionary authority, permitting Todd Eberhard to purchase and sell securities in their accounts without having to obtain the prior approval of the customer. In most instances, however, Todd Eberhard improperly exercised discretion over customer funds by forging, or directing that Breakiron, Heck or Hoberman forge or arrange for someone to forge, customer signatures on forms granting him such discretion. In other instances, Todd Eberhard simply exercised discretion over accounts without the appropriate authority or the appearance of authority to do so. Todd Eberhard exercised discretion over customer accounts despite the fact that such discretionary accounts were not permitted by the rules of certain broker-dealers with which EIA was affiliated, including CSA.

57. From 1991 to 2003, Todd Eberhard churned customer accounts by engaging in excessive and inappropriate trading in those accounts, which caused him to earn excessive commissions, fees and other compensation, and caused substantial losses in his customers' accounts. Todd Eberhard conducted his most excessive churning in customer accounts with the most funds, although he also churned customer accounts with relatively low balances. Todd Eberhard churned not only personal investment accounts but also trust accounts and Individual Retirement Accounts. As Todd Eberhard's customer base grew, and as his financial obligations grew, his churning became more extensive.

58. Todd Eberhard churned some customers' accounts by engaging in the inappropriate buying and selling of "Class B Shares" of mutual funds. Class B Shares typically carry high "back-end loads," which require the owner to pay a substantial fee (which, in part, determines the broker's commission) upon the sale of the mutual fund. These back-end loads, which can be as high as seven percent of the value of the investment, typically decline over time. Consequently, investments in Class B

#810764 v4
104300-48559

Shares are designed for long-term investment strategies, such as retirement accounts. Because of the high transaction costs associated with their premature sale, Class B Shares are generally viewed within the securities industry as an unsuitable vehicle for active trading. Todd Eberhard frequently engaged in short-term transactions in Class B Shares of mutual funds on behalf of his customers, which, as he well knew, were intended solely to generate commissions for himself to the detriment of his customers, and were in violation of his fiduciary duties to his customers.

59. The losses due to churning included, but were not limited to, the following:

(a) in March 2000, Joann Jacobsen deposited $1.3 million into an account managed by Todd Eberhard. Todd Eberhard represented to Joann Jacobsen that her deposit of these assets into an account under his supervision was "just like keeping the funds in the bank." As a result of Todd Eberhard's churning of Joann Jacobsen's account, by December 2001, the market value of the assets in Joann Jacobsen's account decreased by $600,000. From December 2001 to October 2002, the market value of the assets in Joann Jacobsen's account decreased by an additional $400,000, also as a result of Todd Eberhard's churning of the account.

60. The amount of commissions, fees and other compensation earned by Todd Eberhard, whether resulting from excessive and inappropriate trading in customer accounts or inappropriate buying and selling of "Class B Shares" of mutual funds for customers, from February 5, 2002 to the Filing Date or from February 5, 1997 to the Filing Date, as applicable, is unliquidated in total but is at least in the amount of $200,000 per month ("Losses Due to Churning").

**E.    False Statements to Customers**

**1.    False Oral and Written Statements**

- 18 -

61.     Todd Eberhard made numerous materially false statements and misrepresentations to customers designed to persuade them to entrust and continue to entrust funds to Todd Eberhard for management and designed to hide his churning and looting of their accounts.  The effect of these false statements and misrepresentations was that most of the customers to whom they were made continued to maintain their funds and continue their investment advisory relationships with Todd Eberhard and did not pursue civil remedies for their losses, report Todd Eberhard's conduct to authorities or otherwise publicize Todd Eberhard's fraudulent activity.

62.     Todd Eberhard's customers received account statements and other documents directly from the clearing broker with which Park South or CSA maintained relationships.  These account statements and other documentation accurately reflected the activity within the customers' accounts, including the impact of Todd Eberhard's fraudulent activities.

63.     To conceal the effects of his fraud on his customers' financial condition, Todd Eberhard made numerous material misrepresentations and false statements to his customers, both orally and in writing, designed to mislead his customers into believing that the account statements they received from the clearing brokers did not accurately reflect the activity within the accounts or the balances in the accounts.

64.     For example, Todd Eberhard falsely stated to at least one customer that receipt of an inordinate number of trade confirmations did not indicate that there had been excessive trading in a customer's account, because the trades had been placed on a "good until canceled" basis, and because most of the trades had been canceled.  Todd Eberhard made these false statements although he knew

- 19 -

that accounts had been excessively traded and that the trades reflected by trade confirmations had not in fact been canceled.

65.     Todd Eberhard falsely stated to at least one customer that the balance set forth in the account statement sent by the clearing firm did not reflect the entirety of the customer's funds under management by Todd Eberhard because some of the customer's funds were invested elsewhere and not included on the account statement. Todd Eberhard made this false statement although he knew that the customer had no investments other than those contained in the clearing firm statements. The funds in the customer's account were lower than expected due to Todd Eberhard's churning of the account and other misuse of the funds.

66.     Todd Eberhard also falsely stated to at least one customer that, in order to calculate the true value of an account, the customer had to add the value of "trades not settled" to the balance listed on monthly account statements. Todd Eberhard made this false statement although he knew that the value of any "trades not settled" was already reflected in the balance listed on the account statements and that the balance listed on the account statement accurately stated the true financial position of the customer, which was lower than the customer expected due to Todd Eberhard's churning of the account and other misuse of the funds.

67.     Todd Eberhard also falsely stated to at least one customer that checks drawn from customer accounts, or other transfers to third parties not authorized by the customer, were done by accident or mistake. Todd Eberhard made this false statement although he knew that he purposefully and knowingly made and directed EIA employees to cause these improper withdrawals and transfers.

- 20 -

68.     Todd Eberhard also falsely stated to customers that he had served in the military as a Navy SEAL, that EIA had over $2 billion in assets under management and that he considered his customers to be part of his family.

### 2.     Fraudulent Account Statements

69.     Todd Eberhard also made numerous materially false statements and misrepresentations to customers in the form of falsified documents that were intended to persuade customers to entrust and continue to entrust funds to Todd Eberhard for management and designed to hide his churning and looting of the customers' accounts. The effect of these falsified documents was that most of the customers to whom they were provided continued to maintain their funds and continue their investment advisory relationships with Todd Eberhard and did not pursue civil remedies for their losses, report Todd Eberhard's conduct to authorities or otherwise publicize Todd Eberhard's fraudulent activity.

70.     For example, Todd Eberhard created, and directed Mercier to create, fraudulent account statements reflecting artificially high account balances, and these falsified account statements were provided to customers. Todd Eberhard and Mercier fabricated portfolio statements issued on EIA letterhead and altered statements generated by the clearing broker or other financial institution.

71.     With respect to the EIA-generated false account statements, Todd Eberhard and Mercier inflated the value of the customer's investment portfolio by making false entries in EIA's investment tracking software, including changing the market value of securities held by the customer. Todd Eberhard and Mercier then printed, from EIA's computer system and on EIA letterhead, an account statement reflecting the artificially high account balance created through the use of the false computer entries and provided these false account statements to customers.

#810764 v4
104300-48559

72. Todd Eberhard and Mercier also altered certain customer account statements to reflect artificially high account balances. For example, Todd Eberhard and Mercier cut and pasted the name and address of a customer with a low account balance onto the account statement of another customer with a higher account balance. In addition, Todd Eberhard manually altered the balance or other financial information on an account statement before transmitting it to a customer.

### 3. Fraudulent Alteration of Customer's Mailing Address

73. Todd Eberhard and, at Todd Eberhard's direction, Hoberman and other EIA employees also concealed Todd Eberhard's fraudulent activity by changing -- without authorization from customers and in breach of Todd Eberhard's fiduciary duties to them -- customers' addresses of record at the broker-dealer which issued account statements so that the customers would not receive account statements during periods in which Todd Eberhard looted those customers' accounts. Specifically, Todd Eberhard and EIA employees changed the address of record from the customer's address to the address of Todd Eberhard's residence, or to the residence of another EIA employee, without the customer's knowledge or authorization.

74. In at least one instance, when questioned by the customer about the fact that the customer had not received account statements, Todd Eberhard falsely represented to the customer that no statements had been issued during that period, although Todd Eberhard knew that account statements had been issued and that he had directed that they be sent to his own residence or addresses within his control in order to cover up the looting of the customer's account.

### F. Todd Eberhard's Use of the Misappropriated Funds

#810764 v4
104300-48559

75.     Todd Eberhard used the funds he looted from his customers for a variety of improper purposes.  For example, Todd Eberhard used the looted funds for his own personal use, including taking a large monthly draw, causing large cash payments to be made to himself, and paying personal expenses charged on his corporate credit card.  Todd Eberhard also used the looted funds to pay EIA employees exorbitant sums for performing largely clerical tasks as a means of ensuring their continued participation in Todd Eberhard's fraudulent conduct.  Todd Eberhard also used the misappropriated funds to pay large sums to settle complaints with customers who threatened legal action against him based on his fraudulent conduct, and in so doing insisted on confidentiality provisions that were in violation of NASD rules.  Finally, Todd Eberhard used the looted funds to pay former EIA employees who demanded payments in exchange for agreeing not to report his fraudulent conduct to law enforcement or securities regulatory agencies, and in exchange for agreeing not to report to Todd Eberhard's wife, Kristen Eberhard, the fact that Todd Eberhard was having intimate relationships with other women.

**1.     Todd Eberhard's Personal Use of the Misappropriated Funds**

76.     Todd Eberhard used the fraudulent proceeds to  purchase or lease expensive vehicles, including a Hummer and a BMW, and to maintain a chauffeured car for his personal use.

77.     Todd Eberhard also used the fraudulent proceeds for part of the purchase of real estate in Manhattan, which was for his own use and the use of his family.  From December 2001 and December 2002, Todd Eberhard also used the misappropriated funds to pay not less than $114,928.69 in expenses towards his and Kristen Eberhard's mortgage, condominium, management, electric and decorator expenses with regard to their apartment located at 188 East 78th Street, Apartment 9-A,

#810764 v4
104300-48559

New York, New York, as set forth in paragraph 85 herein. Todd Eberhard used the fraudulent proceeds to pay not less than $145,000 towards his and Kristen Eberhard's apartment expenses between 1999 and 2001.

78. Todd Eberhard also used the fraudulent proceeds to make personal real estate investments across the United States and abroad, including, but not limited to, the purchase of an island in Nova Scotia, Canada, as well as apartment buildings and other properties in Atlanta, Georgia and Montreal, Canada. Todd Eberhard used the fraudulent proceeds to make not less than $11,285.83 in real estate investments between February 1, 2002 and January 31, 2003, and he used the fraudulent proceeds to make not less than $271,000 in real estate investments prior to 2002.

79. Todd Eberhard also used the fraudulent proceeds to pay premiums on over 10 life insurance policies issued by Guardian Life Insurance Company ("Guardian"). From 1999 to 2002, over $600,000 in advance premiums was paid to Guardian as a means of concealing the funds from creditors. The SEC Receiver has recovered approximately $450,000 in advance premiums and cash surrender value of the policies, the disposition of which is subject to further court order.

80. Todd Eberhard also withdrew large sums of cash from EIA accounts, including not less than $244,289 between February 1, 2002 and January 31, 2003, and not less than $1,017,000 prior to 2002.

**2. Todd Eberhard's Use of Misappropriated Funds for the Benefit of Kristen Eberhard**

81. Todd Eberhard used at least $525,139.34 of the misappropriated funds for the benefit of his wife, Kristen Eberhard.

- 24 -

82.     For example, Todd Eberhard used the misappropriated funds to pay Kristen Eberhard at least $135,000 in monthly allowance payments, consisting of payments of $5,000 on four occasions in 2000, on 11 occasions in 2001 and on 12 occasions in 2002.

83.     Todd Eberhard also used the misappropriated funds to pay Kristin Eberhard $15,000 in August 2002 for her use in conjunction with her company, Eberhard Management, Inc., an entity in which Todd Eberhard had no ownership interest.

84.     Todd Eberhard also used the misappropriated funds to pay at least $38,210.65 towards Kristen Eberhard's personal American Express credit card expenses, consisting of payments in January 2002 in the amount of $8,354.19; February 2002 in the amount of $6,820.51; April 2002 in the amount of $4,983.52; November 2002 in the amount of $9,926.64; and December 2002 in the amount of $8,125.79.

85.     Todd Eberhard also used the misappropriated funds to pay at least $114,928.69 in expenses towards his and Kristen Eberhard's mortgage, condominium, management, electric and decorator expenses with regard to their apartment located at 188 East 78th Street, Apartment 9-A, New York, New York, including: 16 payments from December 2001 to December 2002 totaling $92,886.87 to Chase Manhattan Mortgage; 9 payments from March 2002 to December 2002 totaling $13,536.27 to Wallack Management for condominium charges; two payments in 2002 totaling $2,489.10 to Empire Condominium Association; 16 payments in 2002 totaling $3,526.70 to Con Edison for electric expenses; and a payment in January 2002 of $2,489.75 to Soft Touch Decorators for decoration expenses.

- 25 -

86.     Todd Eberhard also used the misappropriated funds to pay not less than $145,000 towards his and Kristen Eberhard's apartment expenses prior to 2002.

87.     Todd Eberhard also used the misappropriated funds to pay not less than $77,000 to Kristen Eberhard from 1999 to 2001.

**3.     Todd Eberhard's Use of Misappropriated Funds for the Benefit of Sandi Eberhard**

88.     Todd Eberhard also used at least $82,858.71 of the misappropriated funds for the benefit of his mother, Sandi Eberhard.

89.     For example, Todd Eberhard used the misappropriated funds to obtain health insurance for Sandi Eberhard.  Todd Eberhard accomplished this by placing Sandi Eberhard on the EIA payroll even though Sandi Eberhard performed no work for EIA.

90.     Todd Eberhard used $3,936.24 of the misappropriated funds to pay Sandi Eberhard a monthly a salary consisting of $562.32 per month from June 2002 through December 2002.

91.     Todd Eberhard also used $4,691.13 of the misappropriated funds for health insurance for Sandi Eberhard consisting of a payment in November 2002 of $4,691.13 to United Health Care in the name of Sandi Eberhard (and Kerry Eberhard) and a payment in December 2002 of $4,691.13 to United Health Care in the name of Sandi Eberhard (and Kerry Eberhard).

92.     Todd Eberhard also used the misappropriated funds to pay at least $64,831.34 in expenses towards Sandi Eberhard's mortgage, insurance and decorator expenses with regard to her apartment located at 404 East 76th Street, Apartment 2-N, New York, New York, including: 11 payments in 2002 totaling $36,188.87 to CitiBank; 14 payments from December 2001 to December 2002 totaling $24,893.27 to ABN Amro Mortgage Group; a payment in January 2002 of $313 to

#810764 v4
104300-48559

Travelers for a homeowner insurance policy; and a payment in May 2002 of $3,436.20 to John Flanagan for interior decoration expenses.

93.      Todd Eberhard also used the misappropriated funds to pay at least $9,400 to Sandi Eberhard from 1999 to 2001.

**4.      Todd Eberhard's Use of Misappropriated Funds for the Benefit of Kerry Eberhard**

94.      Todd Eberhard also used at least $37,438.97 of the misappropriated funds for the benefit of his sister, Kerry Eberhard.

95.      For example, Todd Eberhard used the misappropriated funds to obtain health insurance for Kerry Eberhard. Todd Eberhard accomplished this by placing Kerry Eberhard on the EIA payroll even though Kerry Eberhard performed no work for EIA.

96.      Todd Eberhard used $6,747.84 of the misappropriated funds to pay Kerry Eberhard a salary consisting of $562.32 per month from January 2002 through December 2002.

97.      Todd Eberhard also used $4,691.13 of the misappropriated funds for health insurance for Kerry Eberhard consisting of a payment in November 2002 of $4,691.13 to United Health Care in the name of Kerry Eberhard (and Sandi Eberhard) and a payment in December 2002 of $4,691.13 to United Health Care in the name of Kerry Eberhard (and Sandi Eberhard).

98.      Todd Eberhard also used the misappropriated funds to pay at least $26,000 to Kerry Eberhard from 1999 to 2001.

#810764 v4
104300-48559

### 5. Use of Misappropriated Funds to Maintain Employment of Conspirators

99.    Todd Eberhard employed several persons at EIA who were aware of and participated in Todd Eberhard's fraudulent conduct.

100.    Todd Eberhard directed these EIA employees, including Breakiron, Heck, Hoberman and Mercier, to make unauthorized journals of funds from one customer's account to the account of an unrelated customer, make unauthorized wire transfers from customer accounts, distribute false or doctored account statements, negotiate settlement agreements with customers requiring the customers to forego filing claims with NASD and forge customer signatures on letters to support the issuance of checks from customer accounts.

101.    In order to ensure these EIA employees' continued participation in the fraudulent activity, and to obtain their tacit agreement not to report his fraudulent conduct, Todd Eberhard paid exorbitant salaries to employees that were far above market rate for the services provided.

102.    For example, despite the administrative nature of their job duties, Breakiron received an annual salary of approximately $200,000, and Heck received an annual salary of approximately $100,000.

### 6. Use of Funds to Repay Defrauded Customers and Prevent Them from Exposing the Fraudulent Scheme

103.    When certain customers discovered Todd Eberhard's looting of their accounts and confronted him, Todd Eberhard entered into agreements in which he paid customers sums of money to compensate them for losses he caused.  In order to conceal his fraudulent conduct from law enforcement and other customers, Todd Eberhard required that customers who accepted settlement

#810764 v4
104300-48559

payments agree to refrain from notifying the authorities of his conduct or to otherwise publicize the fact that a settlement had been made. These confidentiality provisions were in violation of NASD rules.

104.    From 1999 through 2003, Todd Eberhard entered into agreements to make payments totaling in excess of approximately $4.5 million to customers. These payments were made via lump sums or, more typically, in monthly installments. Many of these payments were made with funds misappropriated from other customer accounts and paid over to attorneys for defrauded customers.

105.    For example, in December 2001, Todd Eberhard executed a settlement agreement with a customer in which he agreed to pay approximately $2 million, principally in monthly payments of approximately $100,000, and which contained a provision restraining the customer from disclosing Todd Eberhard's conduct to authorities.

106.    Todd Eberhard was required to report these settlements to NASD, but purposely and knowingly failed to make the required notification in order to conceal his fraudulent conduct from both securities regulatory and law enforcement authorities, as well as from his other customers who had not yet discovered his fraudulent activity.

### 7.    Use of the Misappropriated Funds to Pay Extortion Demands

107.    Todd Eberhard used misappropriated investor funds to pay Zisselman and Mercier after Zisselman threatened to disclose Todd Eberhard's criminal activities to law enforcement authorities and to disclose Todd Eberhard's marital infidelities to his wife.

108.    In January 2002, at Zisselman's direction, Mercier delivered to Todd Eberhard a hand-written list of customers whose accounts Todd Eberhard had looted and a bound notebook containing e-mails establishing that Todd Eberhard had intimate relationships with women other than his wife.

#810764 v4
104300-48559

109.     Todd Eberhard agreed to pay Zisselman the demanded "hush money," including several hundred thousand dollars up front and approximately $100,000 per month thereafter. From January 9, 2002 to February 2003, Todd Eberhard directed Mercier to wire a total of approximately $1.55 million from EIA's operational bank account to Zisselman. Zisselman gave Mercier approximately $750,000 of the extortion proceeds. Pursuant to the resolution of federal criminal charges resulting from this scheme, Zisselman and Mercier are obligated to make restitution in the amount of the extortion proceeds, and to date approximately half of that amount has been returned to the SEC Receiver, the disposition of which is subject to further court order.

110.     Todd Eberhard also used misappropriated investor funds to pay Breakiron over $718,000 (including a payment for her benefit made to her attorney in the amount of $25,000) of a total $825,000 "severance package," embodied in a written Settlement Agreement that Breakiron entered into with Todd Eberhard and EIA. The fabricated consideration for the Settlement Agreement was Breakiron's alleged promise not to compete and her promise to turnover her client list to Todd Eberhard and EIA. In reality, the "severance package" was the deal they struck to ensure that Breakiron would not report EIA and Todd Eberhard to securities regulators and law enforcement agencies.

## G.     Todd Eberhard Conceals His Conduct From Regulators and Retains Proceeds of His Fraudulent Conduct

111.     In July 2002, the NASD charged Todd Eberhard with multiple violations of securities laws and NASD rules. The charges, as amended in October 2002, included securities fraud, issuing false account statements, settling customer complaints at three firms where he worked without prior approval of the firms, and numerous Central Registration Depository reporting violations. In January

- 30 -

#810764 v4
104300-48559

2005, Todd Eberhard entered into a settlement agreement with NASD in which Todd Eberhard agreed to be barred from the investment industry.

112.     In February 2003, the SEC sued Todd Eberhard and his affiliated entities and obtained a temporary restraining order.  In connection with the SEC's action, the United States District Court for the Southern District of New York ordered that Todd Eberhard provide a list of all assets belonging to him and his affiliated entities, and that all such assets be frozen so that they could be preserved for later distribution to victims of his fraud (the "Freeze Order").  No provision of the Freeze Order prohibits or affects this action determining the liability of Todd Eberhard to the Trustee.

113.     In order to provide an innocent explanation for his theft of funds from certain victims, to obstruct the SEC's investigation of and action against him, and to obtain access to funds that otherwise should have been subject to the Freeze Order, Todd Eberhard created and submitted fraudulent documentation to the SEC.

114.     Specifically, in April 2003, Todd Eberhard created a document (the "Document") which purported to transfer Todd Eberhard's interest in certain real property located in Atlanta, Georgia (the "Atlanta Property") to certain clients (the "Clients") and to Kerry Eberhard.  The Document also expressly provided that any income derived from the Atlanta Property could be used "by Todd Eberhard at his sole discretion for any need or desire."  According to the Document, the transfer of the Atlanta Property became effective on or about April 2, 2000, and the Document purported to be executed and notarized on the same day.

- 31 -

115.     Todd Eberhard, Kristen Eberhard and the Clients, all of whom had purportedly signed the Document on April 2, 2000, created the Document in 2003, and falsely represented that the Document had been executed and signed in 2000.

116.     In order to deceive the Clients from recognizing the fraudulent depletion of their funds, prevent them from aiding the investigation of the SEC, and deter the Clients from participating in procedures established for victims to recover lost funds, Todd Eberhard convinced the Clients to sign the Document purportedly transferring the Atlanta Property to them.  At the same time, Todd Eberhard and Sandi Eberhard told the Clients not to assert publicly that Todd Eberhard had defrauded them and took their money, and instead instructed them to assert that they had received the Atlanta Property in or about April 2000 -- and executed the Document contemporaneously -- pursuant to the terms set forth in the Document.  In accord with the instructions of Todd Eberhard, the Clients filed documents with the District Court and with the SEC Receiver asserting an interest in the Atlanta Property.

**H.     The Impact of Todd Eberhard's Fraudulent Scheme**

117.     As set forth in the "Trustee's Fifth Interim Report for the Period Ended October 31, 2004" ("Trustee's Report") dated November 24, 2004, as of October 31, 2004, the date covered by the Trustee's Report, the Trustee had received a total of 302 customer claims in the SIPA proceeding, many of which alleged theft, conversion and/or unauthorized trading, fraud, misrepresentation, unsuitable investments and excessive commission charges.  The Trustee had sent determination letters to all such claimants as of the end of April 2004.

118.     The Trustee filed a motion dated July 6, 2004, seeking the Court's (i) approval of an initial allocation of property recovered as of May 31, 2004, to the fund of Customer Property

#810764 v4
104300-48559

($1,829,098.00), including the Stone House funds, and to the general estate ($39,783.22) and (ii) authorization to make an interim distribution of the fund of Customer Property ("Customer Fund") and no distribution to general creditors. At the August 5, 2004 hearing on the allocation of property and interim distribution application, the Trustee amended that part of the application that sought to reserve $200,000.00 of the Customer Fund by adding that amount to the total distribution.

119. At the conclusion of the hearing, the Court approved (i) the allocation to the Customer Fund and to the general estate; (ii) each customer's proportionate share of the Customer Fund (24.503%); (iii) the interim distribution, as amended, of the entire amount allocated to the Customer Fund to the over-the-limits customers and to SIPC, as subrogee for its cash advances to the Trustee to satisfy allowed customer claims; and (iv) the deferral of any interim distribution to general creditors.

120. As a result of the *pro rata* distribution, the over-the-limits customer claimants received an additional $1,108,122.25 and SIPC, as subrogee, was reimbursed $720,975.75 for its cash advances to the Trustee of $5,765,000.91 to satisfy claims entitled to customer protection under SIPA.

121. There are now only three remaining over-the-limits customer-claimants (Robert Pellegrini ($376,448.74), Michael David Newbro ($237,851.06) and Deborah Loeffler ($385,680.74)) owed a total of $999,980.54. In addition, SIPC has a remaining subrogation claim of $5,044,025.16.

122. Park South is obligated to the customers in the amount of the misappropriated funds.

123. As a result of the misappropriations, the customers asserted claims in the substantively consolidated Park South and EIA proceeding seeking protection under SIPA in the amount of or exceeding the aggregate amount of misappropriated funds.

#810764 v4
104300-48559

124.     The customers are entitled to receive their ratable share from the Customer Fund pursuant to Section 78fff-2(c)(1) of SIPA, which provides that the Trustee shall allocate Customer Property in the following order:

(a)     first, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-(3)(c)(1) of this title, to the extent such advances recovered securities which were apportioned to Customer Property pursuant to section 78fff(d) of this title;

(b)     second, to customers of such debtor, who share ratably in such Customer Property on the basis and to the extent of their respective net equities;

(c)     third, to SIPC as subrogee for the claims of customers; and

(d)     fourth, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-3(c)(2) of this title.

125.     The Customer Fund is insufficient to (a) pay in full the types of claims set forth in Section 78fff-2(c)(1)(A)-(D), thereby requiring SIPA to advance funds to the Trustee to pay customer claims generally, including the claims of the customers, and (b) reimburse SIPC for its cash advances to the Trustee under Section 78fff-3(a)(1) of SIPA.

126.     The Trustee has satisfied allowed customer claims *pro rata* within the statutory limits from the Customer Fund or by advances from SIPC in accordance with Section 78fff-3(a)(1) of SIPA.

127.     The misappropriated funds increased the pool of claims to be satisfied from the Customer Fund, while it was insolvent or had unreasonably small capital remaining, and thereby reduced the amount of the *pro rata* distribution to customers generally that could be made from the estate.

- 34 -

128.     As of the date of this Complaint, the Defendants have not returned the misappropriated funds, or any portion thereof, to the Trustee.

129.     In view of the fact that "customer property is not sufficient to pay in full the claims [of customers entitled to SIPA protection and SIPC, as subrogee]," under authority of Section 78fff-2(c)(3) of SIPA, the Trustee has commenced the Adversary Proceeding against the Defendants.

130.     To the extent the Trustee is successful in recovering from the Defendants in this Adversary Proceeding, such recovery will be added to the Customer Fund and be subject to a supplemental *pro rata* distribution to the remaining over-the-limits customer-claimants and to SIPC, as subrogee.

## COUNT ONE - TODD EBERHARD

### (Fraudulent Transfers - Actual Fraudulent Intent)

131.     The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

132.     The Unauthorized Withdrawals set forth in paragraphs 41 through 60 and paragraphs 77 through 80 herein were made with actual intent to hinder, delay or defraud an entity to which EIA either was or became indebted on or after the dates of the Unauthorized Withdrawals or when such obligations were incurred and constitute fraudulent transfers in violation of Section 548(a)(1)(A) of the Bankruptcy Code.

133.     These Unauthorized Withdrawals are in the aggregate amount of not less than $14,203,503.52 and consist of $2.3 million in Unauthorized Withdrawals Deposited into Insider Accounts; $3.2 million in Unauthorized Withdrawals Transferred to Third-Party Entities; $2.4 million in

- 35 -

Unauthorized Withdrawals Transferred to Other Customer Accounts; $4.5 million in Losses Due to Churning; $259,928.69 in residential expenses; $282,285.83 in real estate investments; and $1,261,289 in cash withdrawals.

134.     The Trustee is entitled to avoid these Unauthorized Withdrawals pursuant to Section 548(a)(1)(A) of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

135.     The Trustee is entitled to recover from Defendant Todd Eberhard the value of these Unauthorized Withdrawals for the benefit of the Customer Fund pursuant to Sections 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

## COUNT TWO - TODD EBERHARD

### (Fraudulent Transfers - Constructive Fraud)

136.     The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

137.     EIA received less than a reasonably equivalent value in exchange for the unauthorized withdrawals or obligation.

138.     EIA was (a) insolvent on the date or dates of the unauthorized withdrawals or obligation, or became insolvent as a result of the unauthorized withdrawals or obligation, or (b) was engaged in business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with EIA was an unreasonably small capital, or (c) intended to incur, or believed that EIA would incur, debts that would be beyond EIA's ability to pay as such debts matured.

- 36 -

139.     The Unauthorized Withdrawals described in paragraphs 132 and 133 of Count One of this Complaint constitute fraudulent transfers in violation of Section 548(a)(1)(B) of the Bankruptcy Code.

140.     The Trustee is entitled to avoid these Unauthorized Withdrawals pursuant to Section 548(a)(1)(B) of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

141.     The Trustee is entitled to recover from Defendant Todd Eberhard the value of these Unauthorized Withdrawals for the benefit of the Customer Fund pursuant to Sections 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

## COUNT THREE - TODD EBERHARD

### (Fraudulent Conveyances)

142.     The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

143.     The Unauthorized Withdrawals described in paragraphs 132 and 133 of Count One of this Complaint were made by EIA for the benefit of Defendant Todd Eberhard and constitute fraudulent conveyances in violation of N.Y. Debt. & Cred. §§ 273 - 276.

144.     The Trustee is entitled to avoid these Unauthorized Withdrawals pursuant to N.Y. Debt. & Cred. § 278, Section 544(b) of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

145.     The Trustee is entitled to recover the value of these Unauthorized Withdrawals from Defendant Todd Eberhard for the benefit of the Customer Fund pursuant to N.Y. Debt. & Cred. § 278, Sections 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

#810764 v4
104300-48559

## COUNT FOUR - TODD EBERHARD

### (Conversion)

146.    The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

147.    Todd Eberhard's intentional exercise of dominion and control over the funds constituting the Unauthorized Withdrawals described in paragraphs 132 and 133 of Count One of this Complaint was unauthorized by the customers.

148.    Todd Eberhard knew that the funds used to make these Unauthorized Withdrawals were derived from Customer Property and were the proceeds of his scheme, at times effected through EIA and its employees, to defraud the customers.

149.    Todd Eberhard wrongfully exercised and continued to exercise a right of ownership over the funds constituting these Unauthorized Withdrawals to the exclusion of the superior rights of the customers in those funds.

## COUNT FIVE - TODD EBERHARD

### (Breach of Bailment)

150.    The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

151.    The customers transferred or deposited money and/or securities into their accounts for the purpose of having Todd Eberhard manage the Customer Property in accordance with the understanding and instructions of the customers for investment purposes.

152.    The customers entrusted the Customer Property to Todd Eberhard and the EIA employees.

- 38 -

153. Todd Eberhard misappropriated or directed through EIA the misappropriation of the Customer Property by making the Unauthorized Withdrawals described in paragraphs 132 and 133 of Count One of this Complaint.

154. The customers were bailors who bailed their Customer Property to Todd Eberhard and a bailment was thus created.

155. Todd Eberhard had a duty to account for the Customer Property.

156. Todd Eberhard took possession of the Customer Property as bailee.

157. Todd Eberhard's conduct in misappropriating the Customer Property breached the bailment causing damages to those customers.

## COUNT SIX - KRISTEN EBERHARD

### (Fraudulent Transfers - Actual Fraudulent Intent)

158. The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

159. The Unauthorized Withdrawals set forth in paragraphs 81 through 87 herein were made with actual intent to hinder, delay or defraud an entity to which EIA either was or became indebted on or after the dates of the Unauthorized Withdrawals or when such obligations were incurred and constitute fraudulent transfers in violation of Section 548(a)(1)(A) of the Bankruptcy Code.

160. These Unauthorized Withdrawals are in the aggregate amount of not less than $525,139.34.

161. The Trustee is entitled to avoid these Unauthorized Withdrawals pursuant to Section 548(a)(1)(A) of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

- 39 -

162. The Trustee is entitled to recover from Defendant Kristen Eberhard the value of these Unauthorized Withdrawals for the benefit of the Customer Fund pursuant to Sections 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

## <u>COUNT SEVEN - KRISTEN EBERHARD</u>

### (Fraudulent Transfers - Constructive Fraud

163. The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

164. EIA received less than a reasonably equivalent value in exchange for the unauthorized withdrawals or obligation.

165. EIA was (a) insolvent on the date or dates of the unauthorized withdrawals or obligation, or became insolvent as a result of the unauthorized withdrawals or obligation, or (b) was engaged in business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with EIA was an unreasonably small capital, or (c) intended to incur, or believed that EIA would incur, debts that would be beyond EIA's ability to pay as such debts matured.

166. The Unauthorized Withdrawals described in paragraphs 159 and 160 of Count Six of this Complaint constitute fraudulent transfers in violation of Section 548(a)(1)(B) of the Bankruptcy Code.

167. The Trustee is entitled to avoid these Unauthorized Withdrawals pursuant to Section 548(a)(1)(B) of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

#810764 v4
104300-48559

168.    The Trustee is entitled to recover from Defendant Kristen Eberhard the value of these Unauthorized Withdrawals for the benefit of the Customer Fund pursuant to Sections 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

## COUNT EIGHT - KRISTEN EBERHARD

### (Fraudulent Conveyances)

169.    The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

170.    The Unauthorized Withdrawals described in paragraphs 159 and 160 of Count Six of this Complaint were made by Defendant Todd Eberhard for the benefit of Defendant Kristen Eberhard and constitute fraudulent conveyances in violation of N.Y. Debt. & Cred. §§ 273 - 276.

171.    The Trustee is entitled to avoid these Unauthorized Withdrawals pursuant to N.Y. Debt. & Cred. § 278, Section 544(b) of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

172.    The Trustee is entitled to recover the value of these Unauthorized Withdrawals from Defendant Kristen Eberhard for the benefit of the Customer Fund pursuant to N.Y. Debt. & Cred. § 278, Sections 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

## COUNT NINE - SANDI EBERHARD

### (Fraudulent Transfers - Actual Fraudulent Intent)

173.    The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

174.    The Unauthorized Withdrawals set forth in paragraphs 88 through 93 herein were made with actual intent to hinder, delay or defraud an entity to which EIA either was or became indebted on

#810764 v4
104300-48559

or after the dates of the Unauthorized Withdrawals or when such obligations were incurred and constitute fraudulent transfers in violation of Section 548(a)(1)(A) of the Bankruptcy Code.

175.     These Unauthorized Withdrawals are in the aggregate amount of not less than $82,858.71.

176.     The Trustee is entitled to avoid these Unauthorized Withdrawals pursuant to Section 548(a)(1)(A) of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

177.     The Trustee is entitled to recover from Defendant Sandi Eberhard the value of these Unauthorized Withdrawals for the benefit of the Customer Fund pursuant to Sections 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

## COUNT TEN - SANDI EBERHARD

### (Fraudulent Transfers - Constructive Fraud)

178.     The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

179.     EIA received less than a reasonably equivalent value in exchange for the unauthorized withdrawals or obligation.

180.     EIA was (a) insolvent on the date or dates of the unauthorized withdrawals or obligation, or became insolvent as a result of the unauthorized withdrawals or obligation, or (b) was engaged in business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with EIA was an unreasonably small capital, or (c) intended to incur, or believed that EIA would incur, debts that would be beyond EIA's ability to pay as such debts matured

- 42 -

181.     The Unauthorized Withdrawals described in paragraphs 174 and 175 of Count Nine of this Complaint constitute fraudulent transfers in violation of Section 548(a)(1)(B) of the Bankruptcy Code.

182.     The Trustee is entitled to avoid these Unauthorized Withdrawals pursuant to Section 548(a)(1)(B) of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

183.     The Trustee is entitled to recover from Defendant Sandi Eberhard the value of these Unauthorized Withdrawals for the benefit of the Customer Fund pursuant to Sections 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

## COUNT ELEVEN - SANDI EBERHARD

### (Fraudulent Conveyances)

184.     The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

185.     The Unauthorized Withdrawals described in paragraphs 174 and 175 of Count Nine of this Complaint were made by Defendant Todd Eberhard for the benefit of Defendant Sandi Eberhard and constitute fraudulent conveyances in violation of N.Y. Debt. & Cred. §§ 273 - 276.

186.     The Trustee is entitled to avoid these Unauthorized Withdrawals pursuant to N.Y. Debt. & Cred. § 278, Section 544(b) of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

187.     The Trustee is entitled to recover the value of these Unauthorized Withdrawals from Defendant Sandi Eberhard for the benefit of the Customer Fund pursuant to N.Y. Debt. & Cred. § 278, Sections 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

#810764 v4
104300-48559

## COUNT TWELVE - KERRY EBERHARD

### (Fraudulent Transfers - Actual Fraudulent Intent)

188.     The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

189.     The Unauthorized Withdrawals set forth in paragraphs 94 through 98 herein were made with actual intent to hinder, delay or defraud an entity to which EIA either was or became indebted on or after the dates of the Unauthorized Withdrawals or when such obligations were incurred and constitute fraudulent transfers in violation of Section 548(a)(1)(A) of the Bankruptcy Code.

190.     These Unauthorized Withdrawals are in the aggregate amount of not less than $37,438.97.

191.     The Trustee is entitled to avoid these transfers pursuant to Section 548(a)(1)(A) of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

192.     The Trustee is entitled to recover from Defendant Kerry Eberhard the value of these Unauthorized Withdrawals for the benefit of the Customer Fund pursuant to Sections 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

## COUNT THIRTEEN - KERRY EBERHARD

### (Fraudulent Transfers - Constructive Fraud)

193.     The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

194.     EIA received less than a reasonably equivalent value in exchange for the unauthorized withdrawals or obligation.

- 44 -

195. EIA was (a) insolvent on the date or dates of the unauthorized withdrawals or obligation, or became insolvent as a result of the unauthorized withdrawals or obligation, or (b) was engaged in business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with EIA was an unreasonably small capital, or (c) intended to incur, or believed that EIA would incur, debts that would be beyond EIA's ability to pay as such debts matured.

196. The Unauthorized Withdrawals described in paragraphs 189 and 190 of Count Twelve of this Complaint constitute fraudulent transfers in violation of Section 548(a)(1)(B) of the Bankruptcy Code.

197. The Trustee is entitled to avoid these Unauthorized Withdrawals pursuant to Section 548(a)(1)(B) of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

198. The Trustee is entitled to recover from Defendant Kerry Eberhard the value of these Unauthorized Withdrawals for the benefit of the Customer Fund pursuant to Sections 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

## COUNT FOURTEEN - KERRY EBERHARD

### (Fraudulent Conveyances)

199. The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

200. The Unauthorized Withdrawals described in paragraphs 189 and 190 of Count Twelve of this Complaint were made by Defendant Todd Eberhard for the benefit of Defendant Kerry Eberhard and constitute fraudulent conveyances in violation of N.Y. Debt. & Cred. §§ 273 - 276.

- 45 -

201.    The Trustee is entitled to avoid these Unauthorized Withdrawals pursuant to N.Y. Debt. & Cred. § 278, Section 544(b) of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

202.    The Trustee is entitled to recover the value of these Unauthorized Withdrawals from Defendant Kerry Eberhard for the benefit of the Customer Fund pursuant to N.Y. Debt. & Cred. § 278, Sections 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA.

## COUNT FIFTEEN - ALL DEFENDANTS

### (Unjust Enrichment)

203.    The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

204.    The Defendants, in equity, should not be permitted to retain the value of the Unauthorized Withdrawals and described in paragraphs 132 and 133 of Count One, paragraphs 159 and 160 of Count Six, paragraphs 174 and 175 of Count Nine and paragraphs 189 and 190 of Count Twelve of this Complaint, which withdrawals were wrongfully taken from the customers without the customers' authorization.

205.    Accordingly, Defendants have been unjustly enriched in the amount of the Unauthorized Withdrawals.

## COUNT SIXTEEN - ALL DEFENDANTS

### (Constructive Trust)

206.    The Trustee realleges and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

207.    Todd Eberhard was a fiduciary of the customers.

#810764 v4
104300-48559

208. The customers deposited funds into their accounts at EIA based upon the express or implied promise of Todd Eberhard that he and his agents, among other things, would follow the customers' trading and related instructions with respect to the customers' accounts at EIA and act in the best interests of the customers.

209. The Defendants were unjustly enriched as a result of the scheme to defraud the customers.

210. The Defendants will continue to be unjustly enriched if a constructive trust is not imposed over any and all property, interests, profits, benefits or consideration of any kind received by the Defendants by reason of Defendants' aforementioned wrongful conduct.

211. Alternatively, a constructive trust should be imposed to the extent that the Trustee has no adequate remedy at law for the harm and damages caused by the Defendants.

WHEREFORE, the Trustee requests that the Court enter judgment against the Defendants and in the Trustee's favor, as follows:

A. Against Defendant Todd Eberhard and in the Trustee's favor in the amount of $14,203,503.52:

> (i) On Counts One and Two of this Complaint, based upon actual and constructive fraud pursuant to Sections 105(a), 548(a)(1), 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA;

> (ii) On Count Three of this Complaint, based upon actual and constructive fraud pursuant to N.Y. Debt. & Cred. § 278, Section 544(b), 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA;

- 47 -

(iii)      On Counts Four and Five of this Complaint, based upon conversion and breach of bailment, respectively, pursuant to Section 105(a) of the Bankruptcy Code, Section 78fff-2(c)(3) of SIPA and common law; and

(iv)      On Count Fifteen of this Complaint, based upon unjust enrichment pursuant to Section 105(a) of the Bankruptcy Code, Section 78fff-2(c)(3) of SIPA and common law;

B.      Against Defendant Kristen Eberhard and in the Trustee's favor in the amount of $525,139.34:

(i)      On Counts Six and Seven of this Complaint, based upon actual and constructive fraud pursuant to Sections 105(a), 548(a)(1), 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA;

(ii)      On Count Eight of this Complaint, based upon actual and constructive fraud pursuant to N.Y. Debt. & Cred. § 278, Section 544(b), 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA; and

(iii)      On Count Fifteen of this Complaint, based upon unjust enrichment pursuant to Section 105(a) of the Bankruptcy Code, Section 78fff-2(c)(3) of SIPA and common law;

C.      Against Defendant Sandi Eberhard and in the Trustee's favor in the amount of $82,858.71:

- 48 -

(i)        On Counts Nine and Ten of this Complaint, based upon actual and constructive fraud pursuant to Sections 105(a), 548(a)(1), 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA;

(ii)      On Count Eleven of this Complaint, based upon actual and constructive fraud pursuant to N.Y. Debt. & Cred. § 278, Section 544(b), 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA; and

(iii)    On Count Fifteen of this Complaint, based upon unjust enrichment pursuant to Section 105(a) of the Bankruptcy Code, Section 78fff-2(c)(3) of SIPA and common law;

D.       Against Defendant Kerry Eberhard and in the Trustee's favor in the amount of $37,438.97:

(i)        On Counts Twelve and Thirteen of this Complaint, based upon actual and constructive fraud pursuant to Sections 105(a), 548(a)(1), 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA;

(ii)      On Count Fourteen of this Complaint, based upon actual and constructive fraud pursuant to N.Y. Debt. & Cred. § 278, Section 544(b), 550(a) and 551 of the Bankruptcy Code and Section 78fff-2(c)(3) of SIPA; and

(iii)    On Count Fifteen of this Complaint, based upon unjust enrichment pursuant to Section 105(a) of the Bankruptcy Code, Section 78fff-2(c)(3) of SIPA and common law;

- 49 -

E.      Alternatively, against all Defendants on Count Sixteen imposing a constructive trust in favor of the Trustee over any and all property, interests, profits, benefits or consideration of any kind received by the Defendants by reason of Defendants' aforementioned wrongful conduct;

F.      On all Counts of this Complaint awarding attorneys' fees and costs of suit; and

#810764 v4
104300-48559

G.     Such additional relief as this Court deems just and appropriate.


Dated: Newark, New Jersey                    GIBBONS, DEL DEO, DOLAN
February 7, 2005                              GRIFFINGER & VECCHIONE
                                             A Professional Corporation

                                             By:_____/s/ Geraldine E. Ponto_____
                                                  David J. Sheehan (DS-4818)
                                                  Geraldine E. Ponto (GP-2849)
                                                  Timothy S. Susanin (TS-1577)
                                                  Ghillaine A. Reid (GR-0417)

                                             One Penn Plaza - 37th Floor
                                             New York, New York  10119-3701
                                             (212) 649-4700

                                             and

                                             One Riverfront Plaza
                                             Newark, New Jersey  07102-5496
                                             (973) 596-4500

                                             Attorneys for the Trustee

#810764 v4
104300-48559